## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SUSAN L. LOPEZ,

        Plaintiff,

v.                                                                          No. CIV 03-379 LFG

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Susan L. Lopez ("Lopez") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Lopez was not eligible for Disability Insurance Benefits ("DIB"). Lopez moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. 13.]

Lopez was born on October 23, 1955 and was 46 years old when the administrative hearing was held. She completed the 9th grade and obtained her G.E.D. [Tr. at 41.] Lopez worked as a tuner operator[1] for Wireless Component Division from about 1988 until she quit her job in February 2001. [Tr. at 112.] Her past relevant work is as a tuner operator and secretary. [Tr. at 136.] After

---

[1]At the administrative hearing, Lopez described her job as having to use a small hand set drill to tune a filter to a radio frequency for cell phone transmission. The drill weighed about three pounds. She had to hold the drill during most of her work, and she performed some shift work. [Tr. at 36-41, 172.]

quitting her job, she took some courses at the Technical Vocational Institute ("TVI"), including math, English and computer classes. [Tr. at 53.] She is married and has grown children.

Lopez alleges that the onset of her disability was February 1, 2001 due to asthma, allergies, tendinitis, and arthritis. [Tr. at 16, 111.] However, Lopez clarified that her disability stems from her tendinitis and related injuries to her upper extremities, rather than her asthma which is controlled with medication. [Tr. at 130.] Lopez asserts that she stopped working in February 2001 because of pain in her arms, fingers, knuckles and elbow. [Tr. at 16.]

On March 15, 2001, Lopez filed an application for DIB. [Tr. at 96.] Her application was denied at the initial and reconsideration stages [Tr. at 74-75], and she sought timely review from an Administrative Law Judge ("ALJ"). An administrative hearing was held on August 27, 2002. [Tr. at 31-72.] In a thorough and well-reasoned decision, dated November 17, 2002, ALJ David R. Wurm ("Judge Wurm") found that Lopez was not disabled within the meaning of the Social Security Act ("the Act") and denied the request for DIB. [Tr. at 16-21.] Lopez challenged this determination to the Appeals Council which denied her request for review on February 13, 2003. [Tr. at 6.] This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[5] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's residual functional capacity ("RFC"),[8] age, education and past work experience, she is capable of performing other work.[9]  If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[10]

---

[3] 20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4] 20 C.F.R. § 404.1520(b) (1999).

[5] 20 C.F.R. § 404.1520(c) (1999).

[6] 20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7] 20 C.F.R. § 404.1520(e) (1999).

[8] One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[9] 20 C.F.R. § 404.1520(f) (1999).

[10] Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy.  Id. at 669-670.  Before applying the grids, the ALJ must first find the following: "(1) that the claimant has no significant non-exertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category." Id. at 669 (*relying on* Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)).  Non-exertional limitations can include mental impairments.  The grids do not consider non-exertional limitations; therefore, if significant non-exertional limitations are present, the grids may not be applicable.  Id.  However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work." Id. (internal citations omitted.)  In this case, the ALJ solicited testimony of a vocational expert in determining that Lopez could perform other work existing in significant numbers within the national economy.  [Tr. at 21, 68.]

### Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the

4

Commissioner's determination is limited.  Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Id. at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After reviewing Lopez's medical records, symptoms and complaints (Tr. at 17-18), the ALJ rejected Lopez's claim for SSI at step five, concluding that she had the RFC to perform a significant range of light work.  (Tr. at 21.)  In reaching this decision, Judge Wurm  made the following findings:  (1) Lopez had not engaged in substantial gainful activity since her alleged onset date; (2) Lopez had an impairment or combination of impairments that were considered "severe" in terms of her tendinitis, but her alleged mental impairment was not "severe"; (3) the impairments did not meet a Listing; (4) Lopez's allegations regarding her limitations were not totally credible; (5) Lopez had the RFC for light exertion work, limited to non-repetitive pushing/pulling, non-repetitive reaching and manipulative actions, all of which fell between "occasional and frequent"; (6) Lopez had moderate

5

limitations in concentration, persistence and pace secondary to stress and tolerance and additional limitations as to environments with dust, fumes and smoke; (7) she was unable to perform any of her past relevant work; and (8) Lopez had the RFC to perform a significant range of light work that existed in significant numbers in the national economy. [Tr. at 17-21.]  Therefore, the ALJ concluded that Lopez was not disabled as defined by the Act.  [Tr. at 21.]

In this appeal, Lopez asserts that the case must be reversed and remanded for a number of reasons:  (1) the ALJ erred in discrediting Lopez's complaints of disabling pain; (2) the ALJ erred in concluding that Lopez could perform other work existing in the national economy; (3) and/or the ALJ failed to provide substantial evidence that Lopez could perform other work based on the limitations she described.  [Doc. No. 14.]  The Commissioner claims the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations.  [Doc. 15.]

## Summary of Lopez's Medical Care/Conditions

The earliest medical records begin in 1997.  On August 7, 1997, Lopez was seen by Dr. Mancha at the Industrial Rehabilitation Clinics ("IRC") regarding complaints of pain to her left wrist. Dr. Mancha believed she might have tendinitis secondary to work-related repetitive motion activity. She was provided with a splint and referred to physical therapy.  Dr. Mancha anticipated 0% impairment rating but temporarily restricted her work to no "tuning" activity.  [Tr. at 267.]  On August 13, 1997, Lopez began physical therapy.  The therapy notes indicate that her pain interfered with her ability to drive and cook.  The therapist believed Lopez's activity-related tendinitis would respond well to treatment.  At the time, Lopez exercised by running or jogging. [Tr. at 160.] Lopez continued receiving physical therapy through August, and by August 28, 1997, the records indicate

that she had made excellent progress in decreasing her pain.  [Tr. at 154.]  Dr. Mancha found that about 70 to 80% her pain was resolved.  [Tr. at 260.]

However, on September 9, 1997, Lopez complained of increased pain to her right wrist and forearm.  [Tr. at 149.]  On September 16, 1997, Dr. Reeve, also with IRC, saw Lopez and believed her pain to be causally related to repetitive activity.  Physical therapy had not resolved it, so he began transcutaneous neuro electrical stimulation.  [Tr. at 257.]  By October 15, 1997, after receiving a series of treatments, Lopez's pain was completely resolved.  She was given a 0% impairment rating. [Tr. at 244.]

On April 22, 1998, Lopez was seen at Lovelace regarding her allergies and chronic rhinitis. [Tr. at 288.]  On August 18, 1998, Dr. Reeves again evaluated Lopez regarding pain and tingling to her left wrist and hand.  He believed she had epicondylitis (also known as "tennis elbow") on the left side and/or left forearm tendinitis that again was causally related to work.  However, Dr. Reeve anticipated 0% impairment and started treating her with deep heat, ultrasound and massage.  [Tr. at 241.]  There are no additional medical records for 1998.

In 1999, Lopez was seen at Lovelace regarding her allergies and exposure to chemicals.  [Tr. at 286.]  On August 30, 1999, Dr. Reeve saw Lopez related to sharp and localized pain over her elbow and thumb.  The cause of the pain was repetitive activity and tuning at work.  Dr. Reeve limited her work to non-tuning activities and started her on therapeutic intervention.  [Tr. at 236.]

On September 15, 1999, Dr. Reeve noted that the x-rays of Lopez's thumb did not reveal any significant injury or fracture.  She had mild arthritic changes and was given an injection.  [Tr. at 228.] She received another series of treatments during this time period, and a later record indicates that the injection she received was curative.  [Tr. at 220.]

7

In 2000, there are only a few medical records.  In March 2000, she was seen for a follow-up related to her allergies.  She also complained of left shoulder pain that had started about 3-4 weeks earlier after she had been working out and doing shoulder weight exercises.  The doctor suspected rotator cuff and impingement syndrome and recommended she stop the exercises for awhile.  [Tr. at 175.]  A May 9, 2000 medical record indicates that Lopez competed in a local 10K road race during the past weekend.  On June 14, Lopez saw Dr. Walker at Lovelace for insomnia.  She reported that she had been under stress for about 2 ½ months and said she had had trouble sleeping since she was on the night shift at work about four years ago.  She had not been working the night shift recently but was on 12 hour shifts, four days a week and then three days the next.  She described herself as a runner but said she had not been exercising much recently.  Dr. Walker believed she was moderately depressed that day and recommended she seek counseling.  He also strongly encouraged her to start exercising again.  [Tr. at 172.]

On September 13, she was seen at Lovelace for pain, swelling and tingling in her wrist.  She had suffered a wrist contusion when she hit her wrist into a door at home.  She had stopped taking Prozac one month ago and said that Trazodone for sleep had been helping her.  [Tr. at 171.]  On October 16, she reported that she was doing aerobics and running for 20 minutes three or more days a week.  She experienced back pain from sitting at her work.  [Tr. at 169.]

On January 4, 2001, Dr. Reeve at IRC again saw Lopez.  While Lopez reported acute exacerbation of the previous problem and received another injection, she had not seen Dr. Reeve about the problem since September 1999.  [Tr. at 220.]  Dr. Reeve released her to work in her full capacity as of this date.  [Tr. at 219-220.]  On January 31, she began physical therapy again.  She complained of severe pain that interrupted her sleep.  [Tr. at 218.]

8

Lopez alleges that February 1, 2001 is the onset date of her disability relating to tendinitis. She stopped working, even though the records do not indicate any serious problem with tendinitis over the past 15 months. [Tr. at 16.] On February 1, a Psychiatric Review Technique Form was filled out. The report indicated only mild limitations in Lopez's activities, social functioning and concentration. [Tr. at 195.] Lopez's mother had passed away recently and Lopez was still grieving. There was no evidence of a thought disorder, severe cognitive limitations or impaired activities. [Tr. at 197.]

Lopez received physical therapy regularly throughout February 2001. [Tr. at 204-216.] On February 6, 2001, the record indicates that Lopez was "doing so much better – quit her job last week." [Tr. at 216.] On February 14, Lopez reported to Dr. Reeve that she quit her job and felt significantly improved. She still took Vioxx, which continued to resolve most of her symptoms. Her tendinitis was improving. [Tr. at 212.] Later February physical therapy records indicate that Lopez's pain and tightness were much improved. [Tr. at 208.] By February 28, Dr. Reeve stated that Lopez's symptoms were essentially resolved and that she no longer needed medical care. He gave her an 0% impairment rating and released her. [Tr. at 204-205.]

A week later, on March 6, 2001, Lopez submitted her Disability Report. She explained that her job had required her to hold a drill for 11.5 hours and to press a pedal with her legs. She claimed she had to stop working because she could not bear the pain in both arms, legs and her back. [Tr. at 110.] On March 15, 2001, she submitted her DIB application. [Tr. at 96.] On March 19, 2001, in her Daily Activities Questionnaire, she reported that she walked three times per week for one mile, but that she needed about one hour to rest between activities. She also stated that "I enjoy my household chores and I love to cook. I like to stay busy." [Tr. at 124.]

9

On May 16, 2001, Dr. McGrath at Lovelace noted that Lopez's chronic back pain was exacerbated over the last two days after Lopez lifted something from the bottom shelf.  He also indicated Lopez had a history of back problems having worked in an assembly line for years.  He prescribed Lodine for pain and Flexeril for muscle spasms.  [Tr. at 165.]

On May 11, 2001, Dr. Reeve saw Lopez again for aggravation of her preexisting condition.  [Tr. at 202.]  In August 2001, Lopez was taking classes at TVI, including English and computer courses.  [Tr. at 62.]  On September 10, 2001, a disability examiner recorded that Lopez's asthma or allergies were usually controlled by medication but that she had a history of chronic lower back pain.  She also had had pain in her right arm, including the elbow, wrist and thumb, at various times.  She had been treated conservatively for this condition with good results.  [Tr. at 178.]

On October 4, 2001, Dr. Steven Sacks a disability consultant, examined Lopez.  [Tr. at 179.]  He was asked to assess possible psychiatric impairments and restrictions and to comment on her effort and cooperation with the evaluation.  She stated that she had never been evaluated by a mental health care provider before this date.  She started having insomnia in 1995 and was given Amitriptyline then to help with her sleep problem.  Dr. Walker started her on Prozac in June 2000 and Lopez used it for two months with good results.  He then changed the medication to Trazodone which did not help her.  However, she took Trazodone four times a week and then "roughed it" on the other nights.  Dr. Walker had referred Lopez to counseling in June 2000, but she had not followed up.  Lopez felt depressed since May 2001 after her mother died.  She described herself as jogging almost daily.  She did not drink much but occasionally smoked marijuana to relax.  She last smoked marijuana two weeks prior to this evaluation.  All other medical records indicate that she denied any kind of illegal drug use.  [*See, e.g.,* Tr. at 272.]

10

She told Dr. Sacks that she had experienced pain in her arms and hands since 1995, and that she quit her job in February 2001 due to increased pain. She had referred herself to a hand specialist whom she planned to see soon. She was attending TVI for five hours on Mondays and Wednesdays and for two hours on Tuesdays and Thursdays. [Tr. at 179.]

Lopez was able to do housework, go to classes, study and cook. She attended church regularly and a bible study group. She occasionally volunteered for church. She was able to do her own grocery shopping. She enjoyed fishing, camping, and walking. Dr. Sacks concluded she had mild dysthymia and assigned a GAF of 65. [Tr. at 183.] He believed she could deal with the daily stressors and pressures related to work. Lopez described her tendinitis as her primary difficulty.

On November 27, 2001, Lopez saw Dr. Reeve due to increased symptoms along her upper extremities and forearms. She believed that her school work, including writing and typing on the computer, had aggravated her preexisting condition. She was given Toridol intramuscularly for the recurrent tendinitis. [Tr. at 200.]

On the Reconsideration Disability Report, dated November 29, 2001, Lopez indicated that she had seen Dr. Reeve on November 27 for a "very inflamed left wrist," and that she had a "ball that stuck out of her hand." [Tr. at 130.] However, Dr. Reeve's office notes from the November 27 visit did not indicate that her wrist was inflamed or that she had a ball in her hand. Lopez stated in this report that she could not vacuum, could not carry bags, and could not lift a tall class of water. She also reported that social security needed to focus more on the reasons she quit her job rather than on her asthma or other illnesses that were under control. [Tr. at 130.] Lopez further stated that when her hands and/or elbows were swollen, she could not curl or brush her hair, hold a phone or zip up her pants. She was still taking classes at TVI, but both hands and elbows hurt all of the time.

11

On December 7, Lopez did not show up for an appointment with Dr. Reeve.  [Tr. at 199.] She was seen by the Lovelace hand specialist, Dr. McGinty, around that date.  [Tr. at 279.]  On December 10, 2001, Dr. McGinty recorded Lopez's chief complaint as right lateral elbow pain, secondary to hand and wrist pain.  Dr. McGinty reviewed the records from IRC.  Lopez told Dr. McGinty that she had difficulty doing house work even though she wore splints.  Lopez's x-rays showed some arthritis.  Dr. McGinty noted full bilateral symmetric range of motion with mild tenderness.  The doctor's impression was right lateral epicondylitis stemming from a work-related injury.  Lopez also had bursitis in her left shoulder, which appeared to be a new complaint and unrelated to a prior worker's compensation claim of January 2001.  She also had left ulnar wrist probable tendinitis, also a new complaint.  Dr. McGinty wanted her to see a rheumatologist and get a bone scan.

Dr. McGinty further added that Lopez's prognosis should be fairly good.  [Tr. at 276-77.] She observed that Lopez had had good resolution of her tennis elbow in the past and that McGinty suspected Lopez would respond well to various treatment options.  While Dr. McGinty noted that once tennis elbow starts, it can be a chronic problem for quite some period of time, she did not believe Lopez had had an adequate course of treatment for this particular episode of the right tennis elbow.  At this particular point with respect to work status, Dr. McGinty thought Lopez should be on a weight restriction of about 2 pounds for lifting, carrying, and pushing.  [Tr. at 277.]

On January 11, 2002, Dr. McGinty again saw Lopez for upper extremity pain, primarily associated with her right lateral elbow and a secondary complaint of referral to her hands and wrist. Lopez was still having pain in her upper extremities that appeared to be weather-related now.  Lopez noted that the pain was much worse in the winter.  She also stated that she could no longer go to

12

school.  Even having an x-ray done caused her pain.  Her blood work and bone scan all appeared normal.  Dr. McGinty recommended that Lopez have a Functional Capacity Evaluation done.  She also believed that Lopez might have fibromyalgia which would not be work-related.  [Tr. at 269.]

On February 25, 2002, Dr. Frank O'Sullivan, a Lovelace rheumatologist saw Lopez.  She told him that her right upper extremity discomfort began in 1997 and that she had never recovered from the repetitive use syndrome and tendinitis.  Housework and writing aggravated her condition.  She tried to go back to school but had to drop out due to pain.  Lopez was still having trouble sleeping but was not using any tricyclic anti-depressants for her sleep problem even though they had provided some benefit to her.  She wore tennis elbow straps on her right forearm most of the time.  She was taking Naproxen every day and Lortab as needed.  Dr. O'Sullivan observed a good range of motion in her wrists, elbows and shoulder but some joint pain with raising.  Her lab work was normal.  He believed she had myofascial pain syndrome of the right upper extremity.  There was no indication of inflammatory arthritis or inflammatory muscle disease.  Dr. O'Sullivan scheduled nerve conduction studies and an EMG of the right extremity and believed she might benefit from vocational rehabilitation.  [Tr. at 305.]

Dr. Wengs, a Lovelace Neurologist, conducted tests on March 26, 2002, but the results were normal.  There was no evidence of a neuropathy, radiculopathy or myopathy.  [Tr. at 303.]  On March 29, Dr. O'Sullivan saw Lopez again.  He still believed she had myofascial pain syndrome.  The Trazodone was helping Lopez's sleep.  Her wrists, elbows and shoulders all had good range of motion again.  The electrodiagnostic testing of both upper extremities was normal.  He had no suggestions for her at this point.  [Tr. at 301.]

13

On April 5, 2002, Dr. McGinty again saw Lopez. She also noted that the electrical studies were entirely normal. Her rheumatologic work up and bone scan were normal. However, Lopez continued to complain of upper extremity pain and had a hard time sleeping. Darvocet seemed to help her pain, but Lopez claimed that Trazodone was not helping. Dr. McGinty also thought Lopez had myofascial pain syndrome and again recommended she get a functional capacity evaluation. Dr. McGinty prescribed Imipramine for the sleep instead of Trazodone. [Tr. at 299.]

On April 23, 2002, Lopez had the functional capacity evaluation performed at Lovelace. The examiner noted that Lopez was subjected to a battery of tests to see if she was performing within a consistent/maximal effort level. The results indicated both a self-limited and periodically inconsistent performance by Lopez due to reported pain limitations. Lopez reported a pain level of 10 (out of a possible 1-10), but her movement pattern and exertional heart rate did not indicate that level of pain. She was able to lift 11 pounds from the floor occasionally and 6 pounds frequently. She had normal tolerance to squatting, kneeling, stooping and climbing. [Tr. at 296.]

Later at the administrative hearing, Lopez's representative asked her what occurred during the functional capacity evaluation. Lopez testified that she had to wait 30 minutes before she was evaluated and that she was very cold and had aching arms by the time she began. She stated that the male examiner yelled at her, was not very nice to her and attempted to get her to do things she could not do. She also said that he made a religious gesture she did not appreciate and that she was there for four hours. [Tr. at 50-52.]

On June 6, 2002, Dr. McGinty followed up with Lopez. She was given a 19% impairment rating of the right upper extremity and a 15% rating as to the left. Dr. McGinty did not believe further treatment would help. [Tr. at 294.]

14

On August 8, Dr. McGinty reported that Lopez had a flare up of the progression of myofascial pain and believed that she had fibromyalgia. There are no additional medical records after this date.

On August 27, 2002, ALJ Wurm held Lopez's hearing. [Tr. at 31-72.] Lopez was represented by a non-attorney. Lopez noted that she received $181 every two weeks from the workers' compensation claim. [Tr. at 43.] She was able to do house chores, section by section. For example she could do light vacuuming and could load the dishwasher but could not remove dishes. [Tr. at 45.] She could blow dry her hair, brush her teeth and place rollers in her hair. [Tr. at 49-50.]

Lopez testified that she always had lower back pain and had muscle spasms every now and then. [Tr. at 53.] She was unable to sleep normally. She had all of her doorknobs changed in the house because she could not use the round doorknobs. [Tr. at 58-59.] She could stand for a short time and walk for 15-20 minutes twice a week. She used to run but could no longer run now because of her wrists and elbows. [Tr. at 61.] She claimed that flare-ups of pain in her arms and wrists could last as long as three months before subsiding. [Tr. at 64-65.]

At the hearing, the ALJ submitted a hypothetical to the VE with limitations for light exertional work, non-repetitive pushing and pulling, non repetitive reaching and non-repetitive manipulation. He also provided moderate limitations in concentration, persistence and pace, secondary to stress and tolerance, rather than to an intrinsic mental limitation. Environments with dust, fumes and chemicals should be avoided. [Tr. at 67-68.] Based on these limitations, the VE testified that Lopez would be unable to perform her past relevant work but that she could perform other jobs, including photo counter clerk, furniture rental clerk or consultant and space scheduler. [Tr. at 68-69.] Lopez's representative asked the VE what jobs she could perform if unable to lift more than two pounds, and

15

the VE responded that it would be difficult to find any work with those weight restrictions or if Lopez were unavailable to work for weeks to months due to flare ups.  [Tr. at 72.]

Judge Wurm issued his decision on November 7, 2002, denying Lopez's DIB application. [Tr. at 16-21.]

## I.      CREDIBILITY DETERMINATIONS

In reviewing credibility determinations by the ALJ, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." Casias v. Sec'y of HHS, 933 F.2d 799, 801 (10th Cir. 1991).  "Credibility determinations are peculiarly the province of the finder of fact . . . ." McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2000) (internal citation omitted); Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1499 (10th Cir. 1992).  However, the ALJ must explain why specific evidence relevant to each factor supports the conclusion that a claimant's subjective complaints are not credible.  See Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).  "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id.  (internal citation omitted).  So long as the ALJ sets forth the specific evidence he relied upon in assessing credibility, he or she need not conduct a formalistic factor-by-factor recitation of the evidence.  White v. Barnhart, 287 F.3d 903, 909 (10th Cir. 2001).

Furthermore, in evaluating a claimant's complaints of pain, the Court must consider: (1) objective medical evidence of an impairment that causes pain; (2) whether a loose nexus exists between the impairment and the subjective complaints of pain; and (3) whether the pain is disabling based upon all objective and subjective evidence.  Luna v. Bowen, 834 F.2d 161 (10th Cir. 1987). In the final step, the ALJ should also consider the levels of medication and their effectiveness, the

16

extensiveness of the attempts to obtain relief, the frequency of medical contacts, the nature of daily

activities, subjective measures of credibility, and the consistency or compatibility of non-medical

testimony with objective medical evidence. Huston v. Bowen, 838 F.2d 1125, 1132 (10th Cir. 1988).

Here, Lopez argues that the ALJ failed to give reasons for discrediting her statements

regarding pain to doctors, to the SSA and to the ALJ himself. According to Lopez, the ALJ did not

provide sufficient reasons for questioning her credibility. Lopez challenges, in part, the ALJ's reliance

on Lopez's ability to perform certain daily activities, particularly in view of evidence showing Lopez

had to adjust her daily activities based on pain and could no longer do certain things, like homework

and housework. Lopez also argues that the ALJ improperly discounted or ignored the treating hand

specialist's opinion that Lopez had 15% and 19% impairment ratings on her upper extremities as of

June 6, 2002, and instead relied on a non-specialist's opinion that she had an 0% impairment rating

as of March 11, 2001.

In his decision, Judge Wurm noted that the objective medical evidence, including x-rays of

Lopez's upper extremities, were negative. [Tr. at 18.] In addition, while Lopez testified that she

stopped working in February 2001 because of pain, she also testified that she was able to vacuum,

wash dishes, drive, and operate a computer, tasks which all involved the ability to engage in good

manipulative actions. [Id.]

The ALJ further discussed Lopez's treatment records over a period of 18 months, all of which

demonstrated that Lopez's complaints of pain were resolved through the use of medications and

various forms of conservative treatment. [Tr. at 18.] Judge Wurm also acknowledged that Lopez

reported subsequent aggravation of her symptoms, but concluded that the exacerbation was not

viewed as significantly affecting Lopez's activities of daily living and functioning because the evidence

17

demonstrated Lopez was able to attend school for about six months, operate a computer, and drive a car.  She still described her hobbies as dancing, card playing, fishing and using the computer. Objective medical testing again demonstrated a full range of motion of her neck, shoulders, elbow and wrists.  [Tr. at 18.]

It is true that Judge Wurm did not discuss Dr. McGinty's June 2002 impairment ratings of 19% and 15% on her upper extremities.  He did, however, evaluate Dr. McGinty's December 2001 opinion that Lopez was unable to lift any more than 2 pounds at least as of that date.  The ALJ found this assessment by Dr. McGinty to be inconsistent with the overwhelming weight of the other objective evidence, along with Lopez's acknowledged daily activities.  For example, by April 2002, Lopez was able to lift 11 bounds from the floor occasionally and 6 pounds frequently.  [Tr. at 296.] The ALJ also noted that Lovelace medical records indicated good resolution of Lopez's tennis elbow in the past with adherence to a treatment regimen and that the physician expected the same result with the recurrence of Lopez's complaints of pain.  [Tr. at 18.]

Here, the Court concludes that the ALJ "closely and affirmatively linked" his credibility determinations to substantial evidence and that he did not merely offer conclusions in the guise of findings.  Judge Wurm fully considered Lopez's testimony, both in discussing her credibility and in providing limitations to the VE as part of the hypothetical.  He particularly addressed evidence of Lopez's daily activities, which may be considered in making credibility evaluations.  Davis v. Barnhart, 85 Fed. Appx. 170, 2004 WL 33637 at *3 (10th Cir. Jan. 7, 2004).  In reaching his credibility determinations, Judge Wurm also discussed specific objective medical evidence.

The ALJ fully explained his reasons for discounting Lopez's testimony regarding disabling pain, and the Court here concludes that substantial evidence supports Judge Wurm's credibility

determinations.  In so finding, the Court does not re-weigh the evidence, nor does it substitute its own judgment for that of the fact finder.  However, the Court observes, similar to the ALJ, that conservative medical treatment of her symptoms during 1997, 1998 and 1999 consistently resolved her complaints of pain.  [Tr. at 220, 236, 244.]  Moreover, even when Lopez complained of wrist pain in September 2000, she was able to do aerobics and run three days a week or more for 20 minutes in October 2000.  [Tr. at 169, 171.]

In addition, even though Lopez quit working on about February 1, 2001 because of severe pain, less than one month later her symptoms were completely resolved.  Shortly after receiving a 0% impairment rating from Dr. Reeve, Lopez still filed her application for DIB.  Yet, she stated at that time that she enjoyed her household chores and loved to cook.  [Tr. at 124.]  In October 2001, Lopez admitted that she had been attending classes at TVI, was able to do her housework, shop for groceries, study, work on the computer and cook.  She attended church regularly and bible study group.  As noted by the ALJ, she reported that she enjoyed fishing, camping and walking and also that she was running almost daily.  [Tr. at 179.]

In January 2002, Lopez told Dr. McGinty that her pain seemed to be primarily related to the weather.  [Tr. at 269.]  All of the objective medical testing for this period of time indicated good range of motion in the affected areas and no evidence of neuropathy, radiculopathy, myopathy, inflammatory arthritis, or inflammatory muscle disease.  While Dr. McGinty's impairment ratings on June 2002 might provide some evidence to support Lopez's subjective complaints of pain, they must be evaluated in terms of Dr. McGinty's recognition that Lopez's results at the functional capacity evaluation were affected by Lopez's self limitations and inconsistent performance, along with her reports of pain at a level 10 that were not supported.  [Tr. at 294.]  A refusal to cooperate with

19

medical testing procedures undermines credibility.  *See* Nguyen v. Shalala, 43 F.3d 1400, 1404 (10th Cir. 1994).

The Court concludes that the ALJ properly discounted or disregarded Dr. McGinty's workers' compensation impairment ratings, which do not necessarily correlate directly with social security credibility and disability determinations.  *See* Carson v. Barnhart, 242 F. Supp.2d 33, 39 (D. Me.2002) (a permanent-impairment rating "is not directly 'usable' for purposes of analysis under Social Security regulations. The regulations require medical evidence of specific physical limitations rather than conclusory estimates of overall impairment of a body part.") (citations and footnote omitted).

In addition, Dr. McGinty was one of two treating physicians, and Dr. Reeve had seen Lopez on many more occasions through the years.  Dr. Reeve repeatedly found that, after conservative treatment, Lopez had a 0% impairment rating.  Dr. McGinty's ratings are also cast in some doubt by Lopez's inconsistent performance and self-limiting behavior during the Functional Capacity Evaluation.  Finally, none of the objective medical testing at this time clearly supports the impairment ratings.  A treating physician's opinion may be rejected if it is "brief, conclusory, and unsupported by medical evidence."  Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987).

Thus, the Court determines that the ALJ's credibility findings were not erroneous and were supported by substantial evidence.

## II.   ABILITY TO PERFORM OTHER WORK IN THE ECONOMY

Lopez also argues that the ALJ erred at Step 5 in finding that she was capable of performing other work in the national economy.  Lopez again contends that Dr. McGinty's restrictions were improperly disregarded in the ALJ's hypothetical to the VE.  The Court reiterates that the

Commissioner need not provide controlling weight to a treating physician's opinion if it is unsupported by clinical data.  Castellano v. Sec'y of HHS, 26 F.3d 1027, 1029 (10th Cir. 1994); Bernal v. Bowen, 851 F.2d 297, 301 (10th Cir. 1988).

As stated *supra*, Dr. McGinty's December 10, 2001 evaluation that Lopez could not lift more than 2 pounds is not supported by clinical data.  Indeed, Dr. McGinty's own evaluation of Lopez on that date indicated that Lopez's upper extremities were normal appearing, she had full bilaterally symmetric range of motion in her extremities, she was able to internally rotate her left shoulder with only a little tenderness, she had no redness or swelling and no flexor extensor synovitis was observed. [Tr. at 275.]  Dr. McGinty observed some tenderness along the right lateral epicondylar ridge but Lopez was not tender at the medial elbow.  Dr. McGinty did not detect any instability at either wrist area, and no atrophy or weakness.  Lopez was only mildly tender on the ulnar side of the wrist to deep palpation.  Dr. McGinty concluded that Lopez's prognosis, based on her medical history and exam that day, was fairly good.  The weight limitation of two pounds was clearly provided only in terms of "that point" in time.  [Tr. at 277.]  Moreover, the later functional capacity evaluation demonstrated that Lopez, even with her self-limitations and inconsistent performance, could lift more than two pounds.

The Court again concludes that the ALJ properly discounted Dr. McGinty's restrictions, that the ALJ complied with the appropriate regulations and case law in determining Lopez's RFC, and that he further provided restrictions supported by the record in his hypothetical to the VE.  Thus, substantial evidence supports the ALJ's determination that Lopez was able to perform other work in the national economy, and there was no error committed by the ALJ at Step 5 of the evaluation.

21

<u>Conclusion</u>

For all of the above-stated reasons, the Court concludes that Lopez's motion to reverse or

for remand should be denied.

IT IS THEREFORE ORDERED that Lopez's Motion to Reverse or Remand Administrative

Agency Procedure [Doc. No. 13] is DENIED and that this matter is DISMISSED, with prejudice.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge

22